If we're ready to proceed, I'll call the case of the estate of Phyllis Malkin v. Wells Fargo and Berkshire Hathaway. Thank you, and may it please the Court. I'm Ginger Anders, representing Berkshire Hathaway, and arguing on behalf of the appellants. Mr. Patmore is here if there are any questions directed specifically to Wells Fargo. The District Court's decision here rests on three critical errors. First, the Court applied the wrong legal standard to determine whether Ms. Malkin's insurance policy lacks an insurable interest. Under Delaware law as applied in Price-Dawg, Ms. Malkin's insurance policy lacks an insurable interest only if Ms. Malkin and Coventry Capital had a mutual understanding at the time of the policy's inception that Ms. Malkin would transfer the policy to Coventry Capital. On that question, there can be no doubt that genuine disputes of material facts should have precluded summary judgment. The record contains extensive evidence that at the policy's inception, Ms. Malkin had no intention of relinquishing the policy. She had her attorney memorialize her intent to sell the policy and use the proceeds to pay back the premium loan. She told her daughter that she planned to sell the policy, and when the loan matured, she actually attempted to sell the policy. Second, even under the District Court's and the estate's understanding of Price-Dawg, factual disputes should have precluded summary judgment. The District Court treated the use of nonrecourse premium financing and trusts as categorically suspect. When those practices are in fact legal, routine, and beneficial to insurers. And the court also ignored substantial evidence that at all times, Ms. Malkin had sole control over the disposition of the policy. And third, the District Court erred in rejecting the appellant's UCC defense. Both appellants are entitled to protection as bona fide purchasers without notice, and Wells Fargo, as a securities intermediary, should have been held entirely immune from the estate's claim. Let me ask you a question about the first point that you made, and get you to address this quote from Price-Dawg. So this is what Price-Dawg says. The insured's subjective intent for procuring a life insurance policy is not the relevant inquiry. The relevant inquiry is who procured the policy and whether or not that person meets the insurable interest requirements. How do you square your argument with what the Delaware Supreme Court said in that quote? Sure. So I think that quote has to be read in the context of Price-Dawg's entire discussion there. And so I think what the court is saying is that, as it had said several times already in the opinion, an insured can take out a policy with the intent to transfer it to a third-party investor. But the limit on that right, the court says, I think this is at 1075, the limit on that right is that the insured has to be the true procurer of the policy. And so there's an antecedent question, which is, is the insured or a third party the actual person who should be seen as carrying the policy? And so Price-Dawg, I think, makes very clear that in answering that question, one should look to a mutual understanding between the third party and the insured that the insured is going to transfer the policy over to the third party at the inception. OK, well, then address this quote, which the district court I mean, this is the sort of the linchpin of the district court decision to determine who procured the policy. We look at who pays the premiums. So it seems like the Delaware Supreme Court is saying there that you just basically look at who paid the premiums and that determines who procured the policy. Who paid the premiums in this case? So I think what Price-Dawg was saying there is that who paid the premiums is an important indicator of whether a policy is bona fide or not. If the third party pays the premiums, then there's likely to be an agreement there that the policy will be transferred. I do think what the district court understood that to mean, I think, was erroneous because the district court thought that you look at who pays the premiums. And if the insured has used non-recourse premium financing, then that is equivalent. That that allows that alone allows the court to find that the insured hasn't paid the premiums or isn't obligated to pay the premiums. And I don't think that's that's correct. And for one thing, premium financing is expressly authorized under Delaware law. It's often used because it's beneficial to insurers. It enables them to take out these policies while protecting their their liquidity. And certainly the use of non-recourse premium financing isn't inconsistent with an obligation to repay the loan. I think as anyone who's ever taken out a home mortgage understands the fact that the mortgage is not recourse doesn't mean that you're not obligated to pay for the house. You live where I live, the mortgage or recourse. So I guess I'm not really I don't think I'm asking a very difficult question or even a very adversarial question. I mean, I'm just asking who paid the premiums. I mean, I think that she did. Right. Didn't she pay the premiums or did or were the did the premium financer literally write the check to the insurance company? Ms. Malkin, Ms. Malkin paid the premiums by taking out a loan from the from the lender. And one point that's important on that, I think the state repeatedly says that Coventry Capital was the lender here. The lender was LaSalle Bank. LaSalle Bank is a company that's not affiliated with Coventry. And so its interest in this transaction was to have the loan ultimately repaid with interest by by Ms. Malkin. That's the only way in which the bank would make money on this transaction. So actually wanted to avoid relinquishment. Coventry Capital was a servicing agent for LaSalle Bank. And so it was obligated to try to further that objective for the bank. But the way that the loan was structured was that trust was the formal borrower on the loan. The reason that was so is that when the loan is non-recourse, it makes sense to trust because the policy is the collateral for the loan. And so the only thing keeping someone like Ms. Malkin from from assigning the policy away is the fact that the trust is there. Here's the collateral. But it didn't change the substance of the transaction, which is that Ms. Malkin was the settler of the trust. She was the one who had sole authority to direct whether the policy ultimately would be relinquished or whether it would be whether it would be sold. As she as she said that she intended in her attorney memorialization and the proceeds used to pay back the loan. And you can see that I would ask the court to look at the transaction documents. You can see that in the supplement to the trust exhibit trust agreement, which is at one thirty seven three. So Ms. Malkin, as a settler, has the sole authority to direct what happens to the policy. And that document also says that if the policy were sold, then Ms. Malkin was responsible for ensuring that funds sufficient to satisfy the loan would be transferred to the lender. So I think it's quite clear that she was obligated to pay the premiums ultimately because of the market downturn she had to relinquish policy. But I think it's quite clear from the transaction documents that she was obligated to pay the premiums at all time. And that's how that's how the parties also understood it. Coventry Capital, when the loan matured, asked Ms. Malkin what she wanted to do, whether she planned to pay back the loan or whether she planned to relinquish the policy. Everybody, everybody here. There's another quote from Dawes that I'm curious about your response to, which is section twenty seven of four a requires more than just technical compliance at the time of issuance. Indeed, the stolen schemes are created to feign technical compliance with insurable interest statutes. Are you arguing for more than technical compliance here? Absolutely. I mean, I think. The economic reality of this transaction is that Ms. Ms. Malkin applied for these policies. She memorialized her intent to use them as an investment vehicle to sell them to a third party investor, which Price does say is expressly authorized by Delaware law. So I do think that the substance of this transaction clearly is that Ms. Malkin took out the policy. She was using them for her own benefit. As a whole, I think does does focus on the existence of shared intent between the parties. And I think that needs to be the test, because any other test, the test proposed by the estate and by the district court, I think would threaten to destabilize the life settlement market. This is a market that's expressly legal in Delaware. Delaware law allows policies to be assignable. And as price says, this is a market that's beneficial to insure. It's because it enables them to sell unwanted policies for greater value than they'd otherwise get. It enables and enables people like Ms. Malkin to use to take out policies as investment vehicles. But if as the district court held, you just look to whether the person used non recourse premium financing or used to trust. If those things alone are enough to establish that a policy is illegal, then any number of policies are going to be invalidated. Again, these are expressly legal routine practices that a lot of people use. And so if that is the test, then the life settlement market will be undermined. Did Ms. Malkin get any benefit during her life from anyone for taking out this policy? She wasn't given any payment or anything like that. And she did receive insurance during the period during which she held the policy. But as her as the attorney memorialization memorialization document shows, I think her primary purpose here was to use the policy as an investment vehicle and sell it at the conclusion of the loan term. And so that was that that was going to be the primary benefit to her. Yeah, I had a similar question. And so I think I understand it. But you correct me if I'm wrong about the way this is supposed to work. I mean, so so she was basically she was getting the financing to purchase the policy. And she was basically betting at the end of this purchase agreement, I'm going to be able to sell this policy for more than it's worth. More or less, I'm going to be able to sell it for something. There was a market downturn and it turns out she couldn't sell it for something to make any money off of it. So at that point, she just defaulted on the loan and gave the policy to the to the lender. Is that basically what happened here? That's exactly right. That's what she intended to do. She intended to profit off of the investment. And it unfortunately didn't work out that way for her. But certainly her intent at the time of inception was to use this as an investment vehicle. And because she's using it for her own benefit, I don't think there's any way to conclude that as a matter of law. So this was a policy procured by a third party rather than by Ms. Malkin herself. This is her policy. She's using it for her benefit. I have another. If Judge Martin will let me ask another question on this. Yes. So. So this first issue about whether the policy is stolen or not. Is that your position that's definitively going to be answered by the Delaware Supreme Court in the. You know, the other action where there's a question. I do think it's very likely that the second question, the second certified question is will be answered in a way that affects this case. I think that question basically asks whether Delaware law forbids a transaction that is defined by the terms of the question to be materially similar to this transaction. So, in other words, one where an insurer takes out a policy uses non recourse premium financing and intends to sell the policy. So I do think that the Delaware Supreme Court's answer is likely to bear on the proper adjudication of this case. At the same time, though, you know, we do think that under any understanding of price under all all of the sort of tests that the state has proposed, factual disputes should preclude summary judgment. So, you know, there is a minimalist course here in which the court could conclude that there are factual disputes that were improperly resolved against the balance here. And it could remain to the district court on that basis. And then the district court would then have the benefit of the certified questions once they're ultimately answered by the Delaware Supreme Court. Thank you. Good morning, Greg Star on behalf of the estate of Phyllis Malcolm. Let me start with obviously the insurable interest issue. The district court, like seven other federal court judges in a string of four cases, got this issue 100% correct. First off, the district court recognized that the Delaware Supreme Court's decision in price doll was a landmark anti solely decision. It's based on Delaware's constitution and the state's immense public policy against human life wagers. And what price doll very clearly held is all types of human life wages, all types, whether the insured does it completely acting alone or whether it's a third party that uses the insured to procure policy. They're all void ab initio every insurance transaction controlled by Delaware law must be good faith, lawful insurance transaction for a real insurance purpose. Miss Anders wants to set up a test, which she calls this only if test that's unsupported by price. It's a step in the hands of somebody who would rather see the insured dead than alive. That is an illegal transaction under Delaware law. And the main holding of price doll is very clear. Strangers can't procure policies for other strangers. And because 2704 a the insurable interest statute talked about who procured the policy or who really caused it to be when third parties are involved in here, it's absolutely undeniable. This is a third party driven transaction. I'll show some of those facts in a moment when a third party is involved. The question is, who really who really caused that policy to be procured? And courts have to do exactly what you're here, which is scrutinize the entire transaction. Reject any technical or compliance arguments, which is all that we've ever heard from the other side of this case, and not ever allow the mere form of the solely transaction to itself. And, of course, when a trust is used to be a shell to manufacture the policy and hold it to begin with, which is precisely what happens here, the entire transaction falls apart. And this is the final discussion, the price of the entire transaction when the trust is created nominal funding. This trust was $1, $1, and it was used to get $13 million of insurance on a senior citizen in South Florida. And when that trust is just used as as a means to cover up the wage. So let me just ask you, because I just so I just go back to the sentence where the Delaware Supreme Court says to determine who procured the policy, we look at who pays the premiums. And to me, it should just be a fact issue about who stroke the check that went to the insurance company to pay the premiums. So who wrote I mean, who or the check come from to pay the check? Yes, thank you. The check did not come from Mrs. Mouth and that's undisputed. Mrs. Malkin did not have a financial means to your side's hundreds of thousands of dollars. The premium that was paid up front was over $200,000. The borrower under the so-called loan was a sub trust created for the benefit of Coventry Capital with Coventry selected trustee willing Wilmington Trust. And the money to pay the premium went from apparently LaSalle Bank right to the insurance company, American General. Mrs. Malkin, your honor, never had the money to pay this premium. She did not pay the premium in the sunlight case. It was the same insured Mrs. Malkin. Judge Bloom, in that case, scrutinized the record and found just as Judge Cook did on the same record that Mrs. Malkin did not pay the premium. Instead, the premium was paid through what the district court here and in Sun Life helped be a smoke and mirrors loan. What Chief Judge Stark of the District of Delaware scrutinizing the exact same Coventry solely transaction held to be not even a genuine loan. And the Eastern District of New York said the same thing. There was no genuine obligation for the insured in these loans to repay. These loans instead were the whole driver of the transaction. The whole purpose of these loans was to hold the policies for 24 months so that they would be beyond their contestability period. And that's the transaction that Coventry wanted. Why? Starting in 2001, your honor, Coventry had a an agreement with an A.I.G. Owned entity called Lava. Coventry was the contractual originator of life insurance policies for Lava Stone. Lava Stone required that those policies be enforced for 24 months before Lava Stone would take them. And if those policies were originated by Coventry, Lava Stone was required to buy them. If there were characteristics that took those policies outside of the terms of that contract, Lava Stone still had a right of first refusal. So the whole transaction here, contrary to what our friends on the other side would like to suggest, is an investor driven transaction. The evidence is unbelievable and it's undisputed and it's the same evidence as in the Sun Life case. And pretty remarkably, Berkshire and Wells Fargo took no discovery. They didn't take a single deposition to try to come up with a brand new fact that would change what happened in the Sun Life case. Or to contradict any of the evidence that was in the record of bad cases here. And let me just give you a few things. We know that Simba admitted it through statements and through its deposition testimony. Simba went out and had a contract with Coventry in November of 2005 before the policy was issued to recruit for Coventry, ensure senior citizens like Mrs. Malkin to go into a deal which Simba advertised. I'm reading from document 135-9 in the record. Simba advertised these as transactions for insurance. They don't need, want, or plan to ever purchase. And these would be completely risky transactions. Look, this was a scam, no matter how you want to look at it. And to say that Mrs. Malkin, like our friends would like to say, somehow orchestrated this transaction or that she purchased or paid for this policy is just a complete illusion. There are no record evidence, there's no record evidence to support that whatsoever. What do you say about, what do you say about the, I mean, so there's a Delaware statute that specifically says that insurers can use premium financing. And, and so is there something unique about this transaction that would suggest that the premium financing in this transaction was somehow different in the sense that, in the sense of who pays the, you know, who pays for the premium? I'm glad to bring up that statute because this transaction didn't even purport to comply with that Delaware statute. The Delaware premium financing statute has licensing and other requirements that were not met here so they can't take advantage of that statute. And it also has a usury provision. It caps interest plus fees at 9%, okay? And specifically says, this is Title 18, Section 2807, I believe, of the Delaware Code. Anything above that is usury. Now, what happens here, it's rather remarkable. Setting aside that the interest rate here was over 14% and there were a bunch of other fees, Coventry secretly obtained one half of the policy's commissions when the policy was first issued. And on these kinds of large licensing policies, the commission is often 100% of the initial premium payment. We're talking that Coventry, right up front, got over $100,000 in cash for putting together a stole-y scheme. They cannot pass this off as a legitimate premium financing, Your Honor. And they've never tried to suggest it. Berkshire Hathaway has argued that it's relevant that Ms. Malkin intended from the start to sell the policy rather than to relinquish it. Do you think that that's a relevant consideration? Well, as Judge Brasher pointed out, the insured's subjective intent is not the relevant inquiry. That's what Freistahl said. The inquiry is, was the transaction done in good faith? Who procured by looking at who paid? And here that was Mrs. Malkin. And was the insured used as an instrumentality, which we know to be the case? That's what every court looking at this Coventry scheme has said. And really the argument that Ms. Anders is trying to put together here, this only if test, a few things need to be said about that. Number one, this is not an argument that's even brought to the Supreme Court. This new only if test that they claim is the only time Freistahl would invalidate a policy was never raised with the Supreme Court. There are actually eight different summary judgment briefs filed between Wells and Berkshire, if you can believe it. Not one of them mentions even close this supposed test. And for good reason, the this whole argument is actually raised in the Sun Life case where the investor in that case, U.S. Bank, argued that you needed to show a mutual preexisting arrangement between the insured and the actual buyer policy. That argument was rejected by Judge Bloom. It was rejected on appeal to this court. And most recently, Chief Judge Stark in the District of Delaware absolutely eviscerated this argument. I would point you to pages six, 15 through 16 of his opinion in the sole case. He took the investor to task both on the papers and during an extensive oral argument. And ultimately held that there are there's no language in Christoff or the Delaware insurance codes supporting this only if standard. Anything they point to were non-exhaustive, non-limiting descriptions of different kinds of transactions that would also be invalid. And he ultimately held that this this argument would create a loophole that would turn Delaware law and price stall on its head and undo what he called Delaware's constitutionally enshrined public policy of prohibiting human life. Let me let me let me ask you to address just another issue. So. You're arguing effectively that this policy is a void stoley policy, but you are seeking to get the benefits of the policy. Just I mean, this is just sort of a high level question, I guess. Just sort of explain to me how that would be the case if we were to say that this policy was avoid insurance policy. Wouldn't the money just go back to the insurer and just say the policy shouldn't have been effectuated at all? Thank you for that question, too. So since the late 1800s, the majority rule in the country, it's set out by the United States Supreme Court in Warnock versus Davis case has been exactly this, that if money is paid out on a human life wagering policy, the money goes to the family of the insurer on whose life the wager was created. That's always been the law in Delaware. And when the incurable interest statute was enacted in 1968 to include twenty seven or four B, that's what the General Assembly of Delaware decided must be the outcome. Certainly, the General Assembly could have decided some different outcome, including that the money will go back to the insurance company. But the insurance companies in these situations most often pay. And the legislature of Delaware, like twenty nine other states, by the way, with identical statutes, has decided that the way to prevent these transactions from coming to fruition is to essentially deputize these family members of the insured to go after this money. And so this has always been the proper outcome under the common law and in Delaware for well over 100 years. What about what about I'm sorry to interrupt you, but I know we've got limited time. What about Wells Fargo's argument that they were merely an intermediary? They don't have the money anymore. Why are they a proper defendant here? Certainly, the plain language of twenty seven or four B allows our claim to be brought against any payee, beneficiary or other assignee who received the money. And just like any other cause of action could be brought against somebody who was involved in the chain. Here you have Wells Fargo as having been the original payee of the money on a certain policy. Mr. Mr. Sorbet, doesn't the answer to that question can get into the issue of the interplay of the anti-Stoley statute and the Delaware UCC? And, you know, if I haven't had the benefit of my colleagues thoughts about that, but I'm not sure I agree with Judge Cook's resolution of that issue as much as I admire her. So what's the best way to sort that out? You know, let the Delaware court do it or what? What are you doing? The bonafide purchaser defense, first off, is not in front of the court in the Berlin case, Your Honor. But here's here's why the judge got the bonafide purchaser decision correct. There's several reasons. But also, I mean, while you're in your answer, if you would also refer to talk to the Wells Fargo defense about just being an intermediate intermediary. Certainly, certainly. The bonafide purchaser defense is truly a square page round. The UCC bonafide purchaser rule, and in fact, the common law bonafide purchaser rule has only ever in this country, including Delaware specifically, it's only ever been applied in the context of merely voidable contracts or assets. It has never been applied to allow a defense to void ab initio contract. That is very clear. We've challenged our adversaries on that point for well over a year. They've never come up with a case that is otherwise in Delaware or anywhere in the country. We know that Christ also says very clearly that void ab initio, that solely policies are void ab initio, and Christ also says in the 1075 of the court's opinion that a bonafide insurance policy assignment requires a policy that is taken out through good faith and not as a wager to begin with. That sort of ends the discussion. Second point, though, on the bonafide purchaser defense is that essentially what they're asking you to do is find that the UCC would prompt the Constitution of Delaware and the public policy against human life wagers by allowing a subsequent purchaser of a solely policy to keep the proceeds. And certainly that can't be the outcome intended either by the UCC or by the Delaware Supreme Court. And I think that Berkshire and Wells Fargo both understand that that would be the actual outcome. So in their papers, they set up really what I think is a false paradigm. They ask you to compare two statutes and find that the UCC superseded 2704. Setting aside that that ignores the constitutional point, their argument for why they believe the UCC supersedes 2704 is itself not a valid argument. They claim it is so for two reasons. First, they say that somehow Section 8502 of the UCC is the more specific statute on life insurance and insurable interest issues. And of course, that's not true. The UCC and 8502 have nothing at all to do with insurable interest. And then they say, rather remarkably, that the bona fide purchaser concept of Article 8 were the later enacted of the two statutes. But in our papers, we show that's also false. The chronology is very simple. Section 8301 and 302 of the Article 8 of Delaware's UCC were enacted in 1967, a year before 2704B. And so clearly, and the common law bona fide purchaser rule had been in use in Delaware since the 1800s. So clearly, yeah. I appreciate it. Unless my colleagues have a- I'm not sure if we got an answer on Wells Fargo. I don't think we did. Yeah, I'm sorry. I was- As for Wells Fargo, look, their whole defense turns on them trying to claim the same level of immunity under the UCC. It all fails for the same reason. Merely because a large national bank is making money dealing in transactions that turn out to be illegal doesn't mean that it can- It simply gets immunity unless it can satisfy the same elements that would be required. I understand that. You know, my question is, I mean, you're arguing Delaware law to us. The Delaware Supreme Court has taken this case. I mean, is this issue going to be sorted out? The UCC versus Stoey in that case? Or would it be beneficial to have us certify that question to the Delaware Supreme Court? We just want to make the best decision about this question of Delaware law. Understood. So the questions that are being raised with the Delaware Supreme Court are different than the ones that have been- The first question is not one that was ever raised in this case. The second question concerning so-called back-end Stoey deals is different than the only if argument that our friends are making here. And it's the only insurable interest argument they've presented to you. But is it possible that these UCC defenses and these common law defenses are going to come up in the court's analysis of those issues? The Vodafone purchaser defense is not coming up, as I understand it, Your Honor. The Lavastone in the Burland case did not tweet in their answer a Vodafone purchaser defense. And they put in their brief, and their brief does not raise that issue. And what about the securities intermediary question? There's no securities intermediary involved in that. Okay. All right. Thank you very much. Can I ask, Judge, this question in just a slightly different way? Now we know that the Delaware Supreme Court is in the business of answering certified questions on Stoey policies from federal courts. Can we certify some questions to them, too? Would that be a good idea for us to certify some questions in addition to the ones that they've currently granted certification on? Yeah. Well, certainly, the Delaware Supreme Court has always allowed certification. But I don't think it's appropriate in this case. If certification were necessary on the issues here, I think that would have happened back in the Sun Life case on the same act involving the same insurer. Every judge that's looked at these coventry deals has held the same thing. And the questions on insurable interest that Judge Bevis in the Burland case has asked the Delaware Supreme Court to look at are, again, different than the only argument being raised in this appeal on insurable interest, which, again, is one that was never raised below. And I don't even think you have a valid insurable interest appeal in this case. All right. Thanks so much. Thank you, Mr. Starr. Ms. Anders. Thank you. If I could just make four quick points. So on the UCC, as Judge Martin's question suggested, I do think that the district court was clearly wrong to say that there's a statutory conflict here. The 2704B provides a right of action. The UCC provides an affirmative defense for certain defendants in those actions. Rights of actions and affirmative defenses don't conflict. They are simply applied together. The affirmative defense is incorporated into the right of action. So I think that's the way to resolve that question. With respect to the question whether if the policy is void, there would be no bona fide purchase or defense here, I think that argument doesn't work as a matter of statutory interpretation. The statutory hook for that argument is that there's no financial asset here. Because the policy is void, the financial asset doesn't exist. That's clearly not the case. There is a financial asset. It's the proceeds of the policy, which under the UCC, Wells Fargo and Berkshire have agreed to treat as a financial asset in a securities account. So there is an asset here and there's no other textual hook on which one could hang the argument. But you don't you don't disagree that in the Price-Daw case, the Delaware Supreme Court said that these that stole the policies are void ab initio, correct? Price-Daw did say that, and I think that that is one area where potentially the questions that have currently been certified could shed some light on this issue. The first certified question gets at the tension that I think Judge Brasher was mentioning between treating a policy as void, but then also awarding the benefits of the policy to the insured. So it is possible that the Delaware Supreme Court will say something about what it means by saying that the policies are void or even reconsider that determination. So I do think that's a place where the certified questions can be relevant. And if the court does have concerns about. Has anyone has anyone asked the Delaware Supreme Court to reconsider that conclusion? Not directly. I do think the certified question implicitly puts that in play. It's certainly possible that the Delaware Supreme Court won't just in thinking about what issues could be touched by the Delaware Supreme Court in answering those questions. I think that is one. But if if the if this court has doubts about how to apply the UCC and thinking about 2704B here, I do think that certification would be appropriate, especially since we now it's clear that they do take these questions and they try to resolve them expeditiously. Can I ask you a very practical question? So if we were going to certify a question to the Delaware Supreme Court. Need to be our time frame on that. Or do you know? I believe that the Delaware Supreme Court tries to resolve certified questions within a year. And in my understanding for the current question, remind me when they got the certified questions. They got them, I think, around the end of March, sort of around the beginning of April, they accepted the questions. And so the first briefs are already in in that case. And the briefing is slated to be completed by sometime in June, I believe. And so my understanding just from looking at the statistics is that the court tries to act expeditiously and does try to resolve things within a year. That's helpful. So turning to turning to the question of who pays the premiums. You know, I think that the idea that Miss Malkin didn't write the check herself shouldn't be dispositive here. You know, any time one gets a loan, for instance, when one gets a mortgage, for instance, it's the bank that writes the check. It's not the insurer. That's just that's just how the transaction is papered. Of course, Judge Cook said it's undisputed that neither Mr. or Miss Malkin paid the premiums. Neither Miss Malkin nor her husband ever paid the premiums for the policy. I think as a matter of historical fact, Miss Malkin never ended up repaying the loan because she was unable to sell the policy and and repay the loan using the proceeds. So, of course, she indicated her intent in multiple ways to actually do that before the time came. I do think, you know, I mean, you're not disputing what the district court found, you know, called as a matter of undisputed back on that. Neither Miss Malkin or her husband ever paid the premiums for either policy. Well, she ended up, I guess, relinquishing the she took out a loan to pay the premium. She was always obligated to pay those premiums. She ended up pushing the policy. Yes. But I do think you think about somebody in her position who was able to sell the policy and then did turn around and repay the loan. But in any event, in this case, Judge Cook was right about that. She was right that Miss Malkin didn't end up paying out of pocket. But I don't think that should be dispositive of whether the policy has an insurable interest. Because, well, two reasons. One, if you think about somebody who doesn't relinquish, but does manage to sell the policy and pay the proceeds or pay, use the proceeds to pay back the loan. For nobody could say that in that circumstance that the insured hasn't paid hasn't paid the premiums. The only reason that Miss Malkin was unable to realize her intent to do just that here was that we presented evidence. There was a market downturn. So she was unable to. So so asking only whether in the end she ended up being out of pocket for the premiums, I think, would make the interval interest turn on happenstance of what ends up happening a couple of years down the road due to conditions that have nothing to do with the party's understanding at the time that they that they take out the policy. Thank you so much, Miss Andrews. If my colleagues don't have any more questions, I mean, we'll call it quits on this case. We appreciate the arguments. It's helpful. And we have your case.